E-FILED
Thursday, 23 March, 2006  09:41:44 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF ILLINOIS

Kurtis M. William,
        **Plaintiff,**

        **vs.**                  **03-1402**

Arthur D. Funk, Dr. Kurian
and Vicki L. Hetman.
        **Defendants.**

23

## ORDER

    This case is before the court to consider the Defendant, Dr. Arthur D. Funk motion for summary judgment, pursuant to F.R.C.P. 56, d/e 63, and the plaintiff's response thereto, d/e 68.

### Background

    Plaintiff filed his First Amended Complaint on June 30, 2003.  Plaintiff alleges that he was confined at the Stateville Correctional Center from October 26, 1997 through January 28, 2002.  Plaintiff has been confined at Pontiac Correctional Center since January 28, 2002. Plaintiff alleges in Count II of his First Amended Complaint that he received improper medical care from Arthur D. Funk, M.D., between January 28, 2002 through the time plaintiff filed his original Complaint on November 27, 2002.  Specifically, Plaintiff alleges that after he was transferred to Pontiac Correctional Facility on 1/28/02 that Dr. Funk ordered that Plaintiff be denied all treatment that had been previously rendered to him at Stateville Correctional Center, with the exception of PTU thyroid medication.  Plaintiff alleges that PTU, taken in the absence of other treatment, caused the plaintiff to suffer unnecessary painful side effects and that Dr. Funk refused, without medical cause, to provide him with periodic eye testing, dietary supplements, a special diet bag in addition to his regular meal, pain relievers, a back brace, physical therapy, and calcium supplements (Tums) to alleviate problems caused by his thyroid medication.

### Standard

    Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Herman v. National Broadcasting Co., Inc.,* 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied,* 470 U.S. 1028 (1985).  In determining whether factual issues exist, the court must view all the

1

evidence in the light most favorable to the non-moving party.  *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359 (7th Cir. 1988).  A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986).

Undisputed Material Facts

**A.     Attached to the Defendant's summary judgment motion, d/e 63, as Exhibit A is the deposition transcript of the Plaintiff, Kurtis Williams.  Mr. Williams testified to the following undisputed facts:**

1.     The Plaintiff arrived at the Stateville Correctional Center in October of 1998 or 1999.  Ex. A, pg. 9.

2.     The Plaintiff left Stateville on January 28, 2002 and was transferred to Pontiac. Ex A, pg. 9.

3.     Williams believes that he is 5' 11" tall.  Ex. A, pg. 64-65.

4.     He believed he weighed over 189 when he arrived at Pontiac.  Ex. A, pg. 115.

5.     Plaintiff examined a body mass index chart and did not disagree that the ideal weight for a 5' 11" male is between 136-172 pounds.  Ex. A, pg. 64-65.

6.     The Plaintiff understood that with Grave's disease the thyroid gland is excreting too many hormones.  Ex. A, pg. 92.

7.     The Plaintiff understood that PTU counteracts the excessive hormone secretion. Ex. A, pg. 92.

8.     At the time of his deposition, May 18, 2004, the Plaintiff was no longer on PTU. Ex. A, pg. 94.

9.     When he first arrived at Pontiac, the Plaintiff was given an entrance physical examination by Dr. Funk.  Ex. A, pg. 101.

10.    The Plaintiff believed he should have continued to receive Ensure drinks even though the file showed that he weighed 199 pounds when he arrived at Pontiac. Ex. A, pg. 113-114.

11.    Since the Plaintiff has been at Pontiac no healthcare practitioner ever told him that he should be on Ensure.  Ex. A, pg. 137.

12.     The Plaintiff agreed that it was not unreasonable for Dr. Funk to terminate the Ensure and the snack bag (extra food) when he was already overweight according to the BMI (body mass index) chart.  Ex. A, pg. 115.

13.     Since the Plaintiff has been at Pontiac, no healthcare practitioner ever told him that he should have an extra food bag or extra rations.  Ex. A, pg. 137.

14.     The Plaintiff acknowledged that no healthcare practitioner has ever told him that Dr. Funk made an improper decision when he terminated the physical therapy, the back brace, the Ensure, and the extra food.  Ex. A, pg. 124.

15.     The Plaintiff admitted that no one told him that he was not on a proper diet.  Ex. A, pg. 117.

16.     The Plaintiff claims that after his second visit with Dr. Funk the blood tests came back and Dr. Funk adjusted his PTU level.  Ex. A, pg. 123.

17.     The Plaintiff acknowledged that Dr. Funk had a different view point regarding Williams' medical condition and the proper treatment for that condition.  Ex. A, pg. 130.

18.     The Plaintiff acknowledged that Dr. Funk was in a better position to make proper determinations regarding medical treatment.  Ex. A, pg. 130.

19.     Since the Plaintiff has been at Pontiac no healthcare practitioner ever told him that he should have been allowed to continue to use a back brace.  Ex. A, pg. 137.

20.     Since the Plaintiff has been at Pontiac no healthcare practitioner ever told him that he should have continued to receive physical therapy.  Ex. A, pg. 137.

B.     The transcript of Dr. Funk's deposition is attached to his summary judgment motion, d/e 63, as Exhibit B.  Dr. Funk testified to the following undisputed facts:

1.     Dr. Funk graduated from Medical School in 1982 and completed a residency in internal medicine in 1982 through 1985.  Ex. B, pg. 5.

2.     He is licensed in the State of Illinois.  Ex. B, pg. 6.

3.     He has served as the medical director at Pontiac Penitentiary from December 1998 through July 10, 2004.  Ex. B, pg. 10.

4.     e did not see the plaintiff on January 29, 2002, but simply reviewed the written file and made recommendations in his capacity as medical director.  Ex. B, pg. 18-19.

5.     Based on the medical records, Kurtis Williams is 5'11" and his ideal body weight is 150 to 190 lb.  Ex. B, pg. 47.

6.     Dr. Funk completed an initial annual general medical clinical examination of the plaintiff on February 6, 2002, which was the first time he met or examined the Plaintiff.  Ex. B, pg. 19-21.

7.     Based upon his examination of the Plaintiff on February 6, 2002, he did not believe the plaintiff needed extra rations.  His reasoning for that conclusion is that the Plaintiff was overweight and the absence of a medical condition for which he needed supplementary calories.  Ex. B, pg. 43.

8.     No other physicians who examined the plaintiff at Pontiac prescribed extra food, Ensure drinks or anything of that nature.  Ex. B, pg. 45-46.

9.     Ensure is a nutritional supplement in a liquid form which replaces vitamins, minerals and calories in someone that is deficient in those areas.  Ex. B, pg. 42.

3

10. Based upon his examination of Plaintiff on February 6, 2002, the Plaintiff did not need physical therapy. Ex. B, pg. 43.

11. During his examination of the Plaintiff on February 6, 2002 he did not find that the Plaintiff needed calcium supplements. Ex. B, pg. 44.

12. Dr. Funk saw the Plaintiff again on June 6, 2002 and on that date the lab reports indicated that the Graves' disease had burned out, meaning that the disease ran its natural course from being overactive to becoming normal-active and then underactive, and "burnt out" is the terminology for that process. Ex. B, pg. 24-25.

13. Dr. Funk explained that all physicians' orders in the Department of Corrections have a specific time limit. Orders that are written at a previous institution would carry through and are noted in a transfer reception form. With regard to the Plaintiff, the PTU medication was listed as a current valid order and that was prescribed at Pontiac once the Plaintiff arrived there. Ex. B, pg. 29, 41.

14. Based upon his examination of the Plaintiff on February 6, 2002, he saw no need for the Plaintiff to be prescribed Ensure drinks. Ex. B, pg. 42.

15. Dr. Funk determined that the Plaintiff was overweight and there was no need for the Ensure drinks. Ex. B, pg. 42.

16. There was no request by any institution or physician that Plaintiff have physical therapy at the Pontiac Correctional Facility. Ex. B, pg. 43.

17. The Plaintiff was never denied thyroid medication (known as PTU) when it was medically necessary. Ex. B, pg. 44.

18. Dr. Funk denied making any false entries into Mr. Williams medical record or medical chart. Ex. B, pg. 44.

C. Exhibit C, attached Funk's summary judgment motion, d/e 63, is the Affidavit of Arthur D. Funk, M.D. Dr. Funk attests to the following undisputed facts:

1. He first examined the Plaintiff on February 6, 2002. The visit was for general medical clinic for treatment of hyperthyroidism.

2. Attached the Dr. Funk's Affidavit is Exhibit D which is an Initial Annual General Medicine Clinic Examination form that Dr. Funk completed on February 6, 2002. He indicated in that medical record that Plaintiff weighed 199 pounds which put him well above a normal weight limit for an individual who was 5' 11". Since the Plaintiff weighed in excess of the normal weight range, Dr. Funk concluded that Plaintiff did not need extra food or Ensure drinks, which were high in calories. On February 6, 2002, Dr. Funk diagnosed mild exophalmous which is bulging of the eyes, a finding which is consistent with hyperthyroidism. Dr. Funk was of the opinion on February 6, 2002 that plaintiff was euthyroid which means that the hyperthyroidism was not an active disease at that point.

3. A lab test which was performed on February 12, 2002 revealed that Plaintiff's thyroxine (T-4) level was 5.2. The normal range is 4.5-12.0 MCG-CL. Therefore, Plaintiff's thyroxine level was within normal limits meaning that the hyperthyroidism disease was not an active disease on that date.

4. Dr. Funk saw the Plaintiff on February 13, 2002 and blood tests were ordered on that date. Dr. Funk reached the same conclusions and diagnoses on February 13, 2002, as he did on February 6, 2002.

5.      Attached to Dr. Funk's summary judgment motion, d/e 63, is Exhibit E, which is a Physical Examination report dated April 3, 2002 completed by Dr. Kevin Smith. Dr. Smith noted that Plaintiff's exam was normal.

6.      Attached to Dr. Funk's summary judgment motion, d/e 63, is Exhibit F, which is a medical record generated by Dr. Kevin Smith on April 30, 2002.  Dr. Smith examined the Plaintiff and after reviewing lab tests Dr. Smith reported that Plaintiff's thyroid level was normal and that medication known as PTU had been terminated.

7.      Attached to Dr. Funk's summary judgment motion, d/e 63, is Exhibit G, which is a medical record generated by Dr. Bvlatovic on May 30, 2002.  Dr. Bvlatovic concluded that Plaintiff's thyroid condition was normal.

8.      Attached to Dr. Funk's summary judgment motion, d/e 63, is Exhibit H, which is a medical record that Dr. Funk generated on 6/6/02.  At that time Dr. Funk examined the Plaintiff and it was noted that his weight was up to 205 pounds and that he had been off PTU for 35 days.  Dr. Funk diagnosed inactive Grave's disease and noted that Plaintiff's Grave's disease had burned out.

9.      Plaintiff was next seen on October 2, 2002 by Dr. Kurian.  Dr. Kurian's medical record dated October 2, 2002, is attached as Exhibit I, d/e 63.  Dr. Kurian's findings were normal and he indicated a past history of hyperthyroidism.

10.     Attached as Exhibit J, d/e 63, is a medical record dated October 17, 2002 and generated by Dr. Vade.  Dr. Vade examined the plaintiff on October 17, 2002 and determined that Plaintiff's hyperthyroidism was normal and stable.  The October 4, 2002 lab results show that Plaintiff's thyroxine level was in the normal range.

11.     Attached as Exhibit K, d/e 63, is a June 3, 2003 medical record generated by a psychologist who saw patients at the Pontiac Correctional Facility.  In the June 3, 2003 medical record, it was noted that plaintiff was asymptomatic.

12.     Attached as Exhibit L, d/e 63, is a medical record dated September 15, 2003 and generated by Dr. Andrew Kowalkowski, a psychiatrist who treated the Plaintiff.  Dr. Kowalkowski noted that the Plaintiff gave a history of gaining weight and that the Plaintiff tended to be rather preoccupied with his medical condition and complaints.  Dr. Kowalkowski further diagnosed bipolar disorder type II, and axis II personality disorder NOS.

13.     Attached as Exhibit M, d/e 63, is a medical record dated March 4, 2003.  The medical record was generated by the staff dietician and it was noted that the Plaintiff was 5' 11" and weighed 204 pounds.  A dietician recommended a continuation of the regular diet (not an extra rations diet) as prescribed by the physician since Plaintiff was overweight.

14.     Mr. Williams' complaints of decreased visual acuity was not a consequence of or a manifestation of Grave's disease.  The existing medical standard of care for treating a patient with Grave's disease does not require periodic eye testing.

15.     Since Kurtis Williams' arrival at Pontiac Correctional Center on January 28, 2002, there was no objective need found for a comprehensive eye examination other than on December 12, 2003when a physician referred Mr. Williams to the

eye clinic when he complained of decreased vision.  At that time an evaluation
showed that he needed glasses and those glasses were provided.

16.    Dr. Funk found no evidence in Kurtis Williams' medical chart at the Pontiac
Correctional Facility that medically warranted a back brace, physical therapy, or
any additional eye testing.

17.    Based upon Dr. Funk's examination of Kurtis Williams' medical records, he
received appropriate care while at the Pontiac Correctional Facility.

The court notes the plaintff's response to Dr. Funk's summary judgment motion, d/e 68:

Plaintiff believes that his prior filings in this matter demonstrate
that material disputes of fact remain as to whether Defendants
appropriately treated Plaintiff's complaints. As discussed at the
last telephonic status conference with the Court, Plaintiff elects to
rest on his previous filings to demonstrate the existence of such
disputes of fact.

The court notes the following relevant plaintiff's prior filings: 1) original complaint, d/e
1; 2) amended complaint, d/e 35; 3) response to Dr. Kurian's summary judgment motion, d/e 56;
4) response to Dr. Funk's summary judgment motion, d/e 61; response to summary judgment
motions and motion to strike summary judgment motions, d/e 65.   The court notes that the
plaintiff's responses address the issue of exhaustion of administrative remedies, which the court
ruled on in its March 15, 2005 order.  The issue of exhaustion is not an issue in the summary
judgment motions that are currently before this court.

## Discussion

The standard for liability under the Eighth Amendment is deliberate indifference, which
is more than negligence and approaches intentional wrongdoing.  See *Collignon v. Milwaukee
County*, 163 F. 3d 982, 988 (7th Cir. 1998).  Deliberate indifference to a serious injury or medical
need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual
punishment.  *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251
F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976).  The injury
or need must be objectively serious, *and* the official must personally know of the risk and
consciously disregard it.  *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v.
Fairman*, 120 F.3d 88. 91 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593 (2001).  An
objectively serious injury or medical need is "'one that has been diagnosed by a physician as
mandating treatment or one that is so obvious that even a lay person would easily recognize the
necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall
County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th
Cir. 1997)).  An objectively serious condition also presents itself if "'failure to treat [it] could
result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v.
McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373.  The subjective
component (deliberate indifference) does not encompass negligence or even gross negligence.

6

*Id.*, *citing Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991); *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The prisoner must "show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety."  *Wynn*, 251 F.3d at 593, *citing Farmer v. Brennan*, 511 U.S. at 837; *Zentmyer*, 220 F.3d at 811.  A prisoner is not required to show that he or she was "literally ignored."  *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)(jury could find deliberate indifference, "[i]f knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell.").

Deliberate indifference may also be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment."  *Farmer v. Brennan,* 511 U.S. 825, 128 L.Ed. 2d 811, 114 S.Ct. 1970 (1994); *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances.").

Malpractice or disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge.  *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).  A complaint that a physician was negligent in diagnosing or treating an inmate's medical condition does not state a valid Eighth Amendment claim. See *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th th Cir. 2001).  *See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996)(quoting with approval the Eighth Circuit in *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (1996)(abrogated on other grounds in *Reece v. Groose*, 60 F.3d 487 (8th Cir. 1995)): "'An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed.'"(emphasis in *Langston*)).

The Plaintiff has not demonstrated that Dr. Funk acted with deliberate indifference or that Dr. Funk department from accepted professional judgment, practice, or standards.  The plaintiff does not dispute Dr. Funk's assertion that the undisputed facts demonstrate that Dr. Funk properly terminated plaintiff's extra rations (known as a snack bag) and the supplemental caloric drink known as Ensure.  Plaintiff does not dispute that he was already overweight and there was no logical reason to provide him with extra calories.   Dr. Funk's opinion is further supported by the staff dietician who noted that Plaintiff was 5' 11", 204 pounds, and the dietician recommended a continuation of the regular diet only.  Moreover, the Plaintiff acknowledged that Dr. Funk was in a better position to make proper determinations regarding his medical treatment and that no healthcare practitioner ever told the Plaintiff that he was not on a proper diet or that he should have received extra rations or supplemental caloric drinks such a Ensure.

The Plaintiff does not dispute Dr. Funk's assertion that the medical records also demonstrate that the other treating physicians arrived at the same conclusions as Dr. Funk.  The other treating physicians at the Pontiac Correctional Facility did not order dietary supplements,

Ensure drinks, special diet bags, a back brace, physical therapy, or calcium supplements. Furthermore, the Plaintiff does not dispute Dr. Funk's assertion that the medical records demonstrate that plaintiff's symptomatology was consistent with Grave's disease which was being treated with PTU and monitored on a regular basis.  Further, the Plaintiff does not dispute Dr. Funk's assertion that once plaintiff's hyperthyroidism burned out (a normal process for the disease) and became an inactive disease, the PTU medication was appropriately terminated.

Dr. Funk is correct in that this court nor the plaintiff can substitute their opinions for the opinions of trained medical personnel as to what is medically necessary to treat Grave's disease under these circumstances.  The Plaintiff does not dispute Dr. Funk's assertion that the medical records and the undisputed facts outlined above confirm that Kurtis Williams received all necessary medical treatment.  Further, the Plaintiff's allegation that he was denied periodic eye testing and improperly denied a back brace or physical therapy is not supported by any expert witness or any medical standard of care.   The Plaintiff also admitted that no other healthcare practitioner told him that he should have been prescribed a back brace or should have continued to receive physical therapy while at the Pontiac Correctional Facility.  Finally, the treating psychiatrist, Dr. Andrew Kowalkowski, determined that plaintiff had a history of gaining weight and that he was preoccupied with his medical condition.

The medical judgments made by Dr. Funk were made in his professional capacity and are presumptively valid.  See *Youngberg v. Romeo*, 457 U.S. 307, 323, 73 L.Ed. 2d 28, 102 S.Ct. 2452 (1982).  The Seventh Circuit concluded that the presumption of validity was applicable to allegations of improper medical treatment and whether or not the defendant exhibited deliberate indifference.  See *Cole v. Fromm*, 94 F.3d 254 (7th Cir. 1996).  The Plaintiff has presented absolutely no evidence which would overcome the presumption of validity.  The Plaintiff has not demonstrated that Dr. Funk provided inadequate medical care that was a substantial departure from accepted professional judgment, practice, or standards.  Therefore, in the absence of a genuine issue of material fact, summary judgment is granted in favor of Dr. Funk and against the plaintiff.

**It is therefore ordered:**

1.     **Pursuant to Fed. R. Civ. P. Rule 56(c), Dr. Funk's summary judgment motion, d/e 63, is granted.  The clerk of the court is directed to enter judgment in favor of Dr. Funk and against the Plaintiff at the close of this case.  The parties are to bear their own costs.**

2.     **If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $255.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).**

Enter this 23rd  day of March 2006.

s\Harold A. Baker

_____

**HAROLD A. BAKER**
**UNITED STATES DISTRICT JUDGE**