E-FILED
Monday, 27 March, 2006  08:08:57 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

KURTIS M. WILLIAMS,

      Plaintiff,

      vs                               CASE NO. 03-1402

ARTHUR D. FUNK, M.D., individually
and in his official capacity as Medical
Director of Pontiac Correctional Center,
DR. KURIAN, and VICKI L. HETMAN,
in her official capacity as Medical
Administrator of Pontiac Correctional Center,

      Defendants.

**ORDER**

      Before the court are Defendant, Dr. George Kurian's summary judgment motion, d/e 64, and the plaintiff's response, d/e 68.

**Background**

      The plaintiff filed his first amended complaint on 6/30/03.  He alleges that he was confined at the Stateville Correctional Center from October 26, 1997 through January 28, 2002. He has been confined at Pontiac Correctional Center since January 28, 2002.  He alleges in Count I that he received inadequate medical care from Dr. George Kurian. Specifically, the plaintiff claims that between March 1, 200 and December 5, 2000, he was seen by Dr. Kurian on at least three occasions for the following symptoms:  weight loss, excessive sweating, sleeplessness, dizzy spells, tremors, blurred vision, frequent urination, diarrhea, swelling of the thyroid gland, fever, extreme irritability, memory loss, and inability to concentrate.  The plaintiff claims that Dr. Kurian refused to conduct a physical examination and refused to "lay hands on him".  The plaintiff claims that Dr. Kurian's treatment of the plaintiff was limited to the distribution of Tylenol and antibiotics.  The plaintiff further claims that on December 5, 2000, he was seen by another doctor who diagnosed Grave's disease (hyperthyroidism).

**Undisputed Material Facts**

The following facts are taken from the deposition transcript of the plaintiff, attached as Exhibit A, d/e 64.  Mr.  Williams testified to the following undisputed facts:

1.      He agrees that he had been diagnosed with a mental illness prior to March 2000.  Exhibit A, pg. 23.

2.      He believes he was first diagnosed at age seven with hyperactivity, bipolar, depression,

and cognitive disorder associated with aggression.  Ex. A, pg. 23.

3.  When he was first seen by Dr. Kurian in March 2000, he was at Stateville Correctional Center and he believed he exhibited all the signs associated with Grave's disease.  Exhibit A, pg. 39-40.

4.  During the March 2000 exam, the medical technician took Williams' blood pressure, took his temperature, and then Williams recited the symptomatology to Dr. Kurian.  Exhibit A, pg. 41.

5.  Williams agreed that the medical technician plays the same role as an RN at a doctor's office, that the medical technician will take history, temperature, and things of those nature and then the doctor looked at that history and the symptomatology and asked additional questions. Ex. A, pg. 45.

6.  He agreed that Dr. Kurian asked him what problems he was having in March 2000.  Exhibit A, pg. 45.

7.  He admitted that he told Dr. Kurian that he was having discomfort in his sinus area.  Exhibit A, pg. 45-46.

8.  He admitted that he had no medical training.  Exhibit A, pg. 46.

9.  He admitted that he did not know what the standard of care was for any particular healthcare practitioner and he had absolutely no idea what physicians are trained to do under a given set of circumstances.  Exhibit A, pg. 46-47.

10.  He believed the second time he saw Dr. Kurian was in August 2000.  Exhibit A, pg.60-61.

11.  He claimed that during the examination in August 2000 by Dr. Kurian he had the following symptoms: bug eyes, excessive sweating, excessive weight loss, sleeplessness, headaches, sinus problems, extreme diarrhea, and shakes.  Exhibit A, pg.61.

12.  During his second visit with Dr. Kurian in August 2000 he claims he had the same complaints, and Dr. Kurian again simply diagnosed the flu.  Exhibit A, pg. 68.

13.  Williams claims that Dr. Kurian did not touch him during the second examination in August 2000, but he thinks that he may have ordered some tests.  Exhibit A, pg. 69-70.

14.  He admitted that Dr. Smith never told him that the Grave's disease should have been diagnosed earlier.  Exhibit A, pg. 90.

15.  He agreed that Dr. Smith never told him that there was any permanent damage caused by the Grave's disease at that point.  Exhibit A, pg. 90.

16.  He also claims that after he transferred to Pontiac (on January 28, 2002) that several months after the transfer he was seen by Dr. Kurian and diagnosed with flu and prescribed Amoxicillin and Tylenol without a physical examination.  Exhibit A, pg.94-95.

17.  Other than what he already explained, he had no other criticisms of Dr. Kurian.  Exhibit A, pg. 101-102.

The following facts are taken from the deposition transcript of Dr. Kurian, attached as Exhibit B, d/e 64.  Dr. Kurian testified to the following undisputed facts:

18.  Dr. Kurian is licensed to practice medicine in the State of Illinois.  Exhibit B, pg. 6.

19.  He began performing medical services at various facilities operated by the Illinois Department of Corrections in 1987.  Exhibit B, pg. 8.

20.  He worked full time at Stateville Correctional Facility from 1987 through 2001. Exhibit B, pg. 9.

21.  At the time of his deposition, he was employed by Wexford Health Services.  Exhibit B, pg. 9.

22.  Wexford has a contract with the Department of Corrections to provide physicians who treat inmates of the Department of Corrections.  Exhibit B, pg. 9.

23.  The Department of Corrections standard procedure is that when an inmate has a medical complaint the inmate will tell the correctional medical technician or nurse and the correctional medical technician or nurse will record those complaints in a progress note and determine whether the patient should be scheduled for an examination by a physician during "sick call".  Exhibit B, pg. 13.

24.  Correctional medical technicians (CMT's) are typically paramedics, LPN's, or doctors from some other country.  Exhibit B, pg. 14.

25.  After a patient is referred to one of the physicians, the physician will talk with the inmate, determine the inmate's complaint, examine the inmate, make an assessment, and then treat the patient.  Exhibit B, pg. 15.

26.  Correctional medical technicians are allowed to prescribe over the counter medications to prisoners.  Exhibit B, pg. 15-16.

27.  He saw the plaintiff twice at Stateville Correctional Facility (once for a physical exam and once for a sick call exam) and he saw the plaintiff twice at Pontiac Correctional Facility. Exhibit B, pg. 17.

28.  Exhibit F, d/e 64, is a medical record which reflects Dr. Kurian's physical examination of the plaintiff on March 27, 2000.  Exhibit B, pg. 23.

29.  During Kurian's examination of the plaintiff on March 27, 2000, the plaintiff did not complain of any inability to sleep, severe weight loss, that he was suffering from "bug eyes", or that he had excessive sweating.  Exhibit B, pg. 23-24.

30.  If the plaintiff complained of any of those ailments during the March 27, 2000 examination, it would have been documented in the medical record.  Exhibit B, pg. 24.

31.  In the physical examination form, dated March 27, 2000 and marked as Exhibit F, page 2, d/e 64, Dr. Kurian indicated that during his examination, the plaintiff had sinus tenderness, that his pupils reacted to light, and that during the examination he looked at the plaintiff's nose, ears, and sinuses.  Exhibit B, pg. 25-26.

32.  Dr. Kurian's examination on March 27, 2000 revealed that the plaintiff had normal breathing and that the heart rate was regular and in rhythm.  He further noted that the abdomen was soft with no tenderness and that the plaintiff had an erythematous rash around the genital area.  It was further noted that there was a scar on the plaintiff's left forearm, right knee, and on his spine.  During the musculoskeletal examination it was noted that there was no spinous tenderness. It was further noted there was a tattoo on the plaintiff's arm and that the neurological examination was normal.  His assessment was allergy, that the tubercular test revealed zero millimeters and that the plaintiff had defective vision, that the plaintiff had a bipolar disorder, that he had tinea pubis, and sinusitis.  Exhibit B, pg. 25-27.

33.  After the examination on March 27, 2000, Dr. Kurian prescribed a Mycolog ointment and Amoxicillin for 10 days.  Exhibit B, pg. 28.

34.  During the physical examination on March 27, 2000, Dr. Kurian physically placed his hands on the plaintiff.  Exhibit B, pg. 28.

35.  Dr. Kurian acknowledged that he was familiar with the symptoms of Grave's disease

which would include sweating, feeling weak, nervousness, and protruding eyeballs. He did not observe any of those symptoms when he examined the plaintiff at Stateville during calendar year 2000. Exhibit B, pg. 33.

36. The medical note created by a correctional medical technician on September 5, 2000, indicates that the plaintiff had complaints of sinus problems for two weeks and the correctional medical technician diagnosed sinus drainage and elected to refer the plaintiff to a doctor for sick call. Exhibit B, pg. 21.

37. Exhibit H, d/e 64, is a progress note dated September 6, 2000, indicating that Dr. Kurian saw the plaintiff at 9:28 a.m. and that he was seen in sick call with complaints of stuffy nose, headache, and facial pains and that during his examination the plaintiff was alert, awake, and had minimal congestion in his nose, sinus tenderness, and throat congestion. It was Dr. Kurian's assessment that the plaintiff had sinusitis and he prescribed Amoxicillin and Tylenol and advised the plaintiff to return to the clinic as needed. Exhibit B, pg. 20-21.

38. Dr. Kurian denied that he ever observed symptoms of weight loss, nervousness, or protruding eyes when he examined the plaintiff at Stateville Correctional Facility. Exhibit B, pg. 39.

39. On the reverse side of Exhibit L, d/e 64, is a progress note indicating that Dr. Kurian saw the plaintiff on February 21, 2002. Exhibit B, pg. 30-31.

40. The progress note dated February 21, 2002, marked as Exhibit L, d/e 64, indicates that the plaintiff complained of sore throat, cough, chest pains, and that he had no history of fever. The plaintiff complained of shortness of breath and feeling weak and fatigued for three days. He complained of a severe headache. He had a history of sinus problems and he was a smoker. The plaintiff was alert, awake, and not in acute distress. An examination of his nose revealed minimal sinus tenderness was present, that the plaintiff had minimal congestion in his throat, and that his neck glands were present. It was Dr. Kurian's assessment that the plaintiff had an upper respiratory infection and that they should rule out pneumonia and bronchitis. The plaintiff was advised to stop smoking and a chest x-ray was ordered. Erythromycin was ordered along with Tylenol. The plaintiff was to return to sick call after seven days. The plaintiff was also counseled regarding the ill effects of smoking. Exhibit B, pg. 31.

41. During the February 21, 2002 exam, the plaintiff did not make any complaint that Dr. Kurian was examining him. Exhibit B, pg. 32.

42. Exhibit M, d/e 64, is a medical note generated by Dr. Kurian after seeing the plaintiff on October 2, 2002. The plaintiff complained of problems swallowing, history of excessive sweating, eyes bothering him, that he was off PTU medication, and that he had a history of hyperthyroidism which was diagnosed in December 2000. The plaintiff was alert, awake, and not in acute distress. His pupils reacted to light and there were no jugular venous distension. His lungs were clear, abdomen was soft, and bowel sounds were normal. There were no tremors and the assessment was hyperthyroidism. Exhibit B, pg. 34-35.

43. Dr. Kurian's plan after the October 2, 2002 examination was to refer the plaintiff to ophthalmology clinic and to follow up with the plaintiff in two weeks after lab results were conducted and completed. Exhibit B, pg. 35.

44. It was his practice to place his hands upon the patient when conducting a physical examination. Exhibit B, pg. 38.

45.    Dr. Kurian testified that Grave's disease is not an easy diagnosis to make because the symptoms can be symptoms of other diseases.  Exhibit B, pg. 38.

46.    The differential diagnosis for those symptoms can be anxiety, nervousness, cancer, or mental problems.  Exhibit B, pg. 38-39.

The following facts are taken from the affidavit of Dr. Kurian's, attached as Exhibit C, d/e 64.  Dr. Kurian attests to the following undisputed facts:

47.    Exhibit G, d/e 64, is a medical note dated May 23, 2000, which shows that the plaintiff complained to Medical Technician Peterson that he had low back pain.

48.    Exhibit G is a medical note dated August 11, 2000, which shows that the plaintiff complained to Medical Technician Peterson that he had low back pain and that he wanted a prescription for Motrin.

49.    Exhibit G is a medical note dated September 5, 2000, which shows that the plaintiff was seen by Medical Technician Peterson and complained of sinus problems for two weeks.

50.    Exhibit H, d/e 64, is a medical note dated October 1, 2000, which shows that the plaintiff was seen by Medical Technician Taylor and complained of sweating and difficulty breathing.

51.    Exhibit I, d/e 64, is a medical note dated October 3, 2000, which shows that the plaintiff was seen by Medical Technician Bob Cateneo and complained of trouble breathing and upper respiratory infection type symptoms.  The plaintiff was referred to the emergency room.

52.    Exhibit I is a medical note dated October 3, 2000 which shows that the plaintiff was examined by Dr. Andrew Tilden in the emergency room and the plaintiff gave a two week history of a cold and productive cough.  Dr. Tilden ruled out bronchitis and rhinitis. Dr. Tilden did not diagnose hyperthyroidism.

53.    Exhibit J, d/e 64, is a medical note dated October 24, 2000, which shows that the plaintiff was seen by Medical Technician Peterson and asked for Motrin for his low back pain.  The plaintiff did not appear to be in any visible discomfort.

54.    Exhibit K, d/e 64, is a medical note dated November 2, 2000, which shows that the plaintiff was seen by Medical Technician Cateneo and complained of productive cough and allergies.

55.    Exhibit K is a medical note dated November 15, 2000 which shows that the plaintiff was seen by Medical Technician V J (last name unknown) and the plaintiff complained of shaking and possible flu symptoms.

56.    Exhibit K is a medical note dated November 16, 2000 which shows that the plaintiff was seen by Medical Technician Cateneo and complained that he wanted to go to the emergency room even though there were no visible signs of distress.

57.    All medical records generated at the Stateville Correctional Facility and the Pontiac Correctional Facility are records which Dr. Kurian has reviewed and are the type of records which physicians reasonably rely upon in forming their diagnoses and opinions regarding the care and treatment of patients.

The following facts are taken from the deposition transcript of Dr. Andrew Tilden, Exhibit D, d/e 64.  Dr. Tilden testified to the following undisputed facts:

58.     Dr. Tilden started working at Stateville Correctional Center in 1985 as a staff physician. Ex. D, pg. 4.

59.     Tilden's general duties involve care of the patient, especially in the emergency room, emergency room visits, minor surgeries, and regular medical emergencies.  Exhibit D, pg. 6.

60.     Stateville has a situation called "in-house sick call" where Tilden sees sick inmates in cell houses where he examines patients and prescribes medication.  Exhibit D, pg. 6.

61.     Tilden acknowledges that he generated the October 3, 2000 office note which contains his handwriting and signature.  Exhibit D, pg. 6-7.

62.     Exhibit I, d/e 64, is an office note dated October 3, 2000 indicating that Tilden saw the plaintiff at 9:50 a.m., a 40 year old, white male with two weeks history of cold with recent exacerbation times 4 days with productive cough.  The plaintiff was alert and oriented times 3.  The plaintiff's vital signs were: respiration 18, pulse 80, temperature 97degrees Fahrenheit.  The plaintiff's skin was dry, his ear, nose, and throat shows pharynx was red, injectol nose mucosal redness, ears were normal, chest bilateralrhonchi, and wheezing rear of the right base, heart with normal limits, abdomenbenign.  Neuro examination was normal limits.  Assessment No. 1: rule out bronchitis; No. 2: rhinitis.  Tilden noted under the "Plans" column: No. 1: Chest x-ray PA lateral; No. 2: Erythromycin 500 milligrams PO TID No. 30 tablets; No. 3:CTM 4 milligrams PO TAD-PRN No. 12 tablets (a decongestant); No. 4: Tylenol325 milligrams 2 tablets PO TID-PRN No. 12 tablets; No. 4: Return as needed; and No. 5: Lay-in for three days (patient might stay in cell, the meals are brought to him, and he doesn't have to go to work). Exhibit D, pg. 7-8.

63.     The plaintiff did not complain of an accelerated heartbeat.  His cardiac rate was documented as 80 per minute, which is within normal ranges, which is 60 to 100.  Exhibit D, pg. 9.

64.     The plaintiff did not complain of or give a history of weight loss.  Exhibit D, pg. 9.

65.     The plaintiff did not give a history of heat intolerance, diarrhea, rapid pulse, profuse sweating, or irritability.  Exhibit D, pg. 9.

66.     During the examination, Tilden did not notice any prominence of eyes or bulging eyes. Exhibit D, pg, 10.

67.     The plaintiff did not present to Tilden with commonly recognized symptoms of hyperthyroidism.  Exhibit D, pg. 10.

68.     Tilden advised that if symptoms of hyperthyroidism would appear he would mention it in the physical examination.  The findings or protruding orbits versus thyroid enlargement would be physical signs and would be recorded after such presentation. Exhibit D, pg. 10.

69.      When a patient presents with upper respiratory or respiratory infection, usually the lymphatic nodes are checked, anterior neck were in line of the thyroid mass or thyroid gland, it is in line with same area where you check for lymph nodes.  If there would be any enlargement appropriate size of a thyroid gland, this would be a following examination recorded.  Exhibit D, pg. 10.

70.     Tilden's only diagnosis on October 3, 2000 was to rule out bronchitis and rhinitis.  Exhibit D, pg. 10-11.

71.     During the examination of the plaintiff, the plaintiff did not complain to Tilden that other physicians at Stateville, including Dr. Kurian, refused to physically examine him.  Exhibit D, pg. 11.

6

72.   Tilden has diagnosed inmates with Grave's disease, on average, one to two cases per year, which means in 19 years he probably diagnosed between 20 to 25 cases of Grave's disease.  Exhibit D, pg. 12.

73.   The symptoms that would lead Tilden to diagnose Grave's disease are tachycardia (rapid cardiac rate), exophtalmus (a pronounced protruding eyeballs), and enlargement of the thyroid gland, which is visibly in the anterior neck.  Other findings are irritability, nervousness, tremors, and weight loss.  Exhibit D, pg. 12-13.

74.   Tilden testified that there was never an occasion where he diagnosed Grave's disease in a particular patient that had been previously seen by Dr. Kurian and that Dr. Kurian has only prescribed aspirin or Tylenol.  If it came to Dr. Tilden's attention that Dr. Kurian had mis-diagnosed the patient he would have contacted Dr. Kurian, the medical director, and they would have seen the patient immediately.  Exhibit D, pg. 15.

75.   Hyperthyroidism is when the thyroid gland essentially excretes an abnormal amount of hormone.  It is commonly treated with a drug called PTU.  If the disease goes through its full progress, it will burn itself out and then the PTU medication may not be needed.  Exhibit D, pg. 16-17.

The following facts are taken from the deposition transcript of Nurse Jennifer Encarnacion, Exhibit E, d/e 64.  Encarnacion testified to the following undisputed facts:

75.   Encarnacion has worked at Stateville for six and a half years and her current title is Correctional Nurse 2.  Exhibit E, pg. 4-5.

76.   Her general duties are performing physicals and to interview the patient before they are seen by the doctor for a physical exam.  Exhibit E, pg. 5.

77.   A three page document marked as Exhibit F, d/e 64, is the medical record dated March 27, 2000, which she completed and she identified her own handwriting.  Exhibit E, pg. 5-6.

78.   She acknowledged that the medical form was a standard form dated March 27, 2000, used at Stateville Correctional Center in March 2000.  Exhibit E, pg. 7.

79.   She recognized her signature on the medical record.  Exhibit E, pg. 8.

80.   She completed the form on March 27, 2000 as she was interviewing the patient.  Exhibit E, pg. 9.

81.   She understood that when she was completing the medical form on March 27, 2000 that she was taking down important information which the doctor would review.  Exhibit E, 10, pg. 9.

82.   She asked the plaintiff on March 27, 2000, if he had a history of a fever or temperature and that is why she marked the "no" box.  Exhibit E, pg. 10.

83.   She asked the plaintiff on March 27, 2000, if he had a history of diarrhea and he told her no.  Exhibit E, pg. 10.

84.   The plaintiff advised on March 27, 2000 that he did not have night sweats, persistent upper respiratory infections, weight loss, fatigue, or "other" symptoms.  Exhibit E, pg. 11.

85.   If the plaintiff complained of irritability on March 27, 2000, she would have put that down in the "others" section.  Exhibit E, pg. 11-12.

86.   If the plaintiff complained of bulging eyes on March 27, 2000, she would have put that down in the "others" section.  Exhibit E, pg. 12.

87.   If the plaintiff complained of a rapid heartbeat on March 27, 2000, she would have put that

down in the vital signs section.  Exhibit E, pg. 12.

88.    If the plaintiff complained of constipation on March 27, 2000, she would have indicated that in the form.  Exhibit E, pg. 12.

89.    She acknowledges that she filled out all of Page 2 of the form on March 27, 2000.  Exhibit E, pg. 14.

90.    If the plaintiff had any ailments or conditions on March 27, 2000, she would have listed them on this form.  Exhibit E, pg. 14.

91.    If the plaintiff told her on March 27, 2000 that he had an enlarged thyroid gland in his neck she would have listed that complaint.  Exhibit E, pg. 15.

92.    If the plaintiff told her on March 27, 2000 that he had a rapid pulse or profused sweating, she would have listed that complaint.  Exhibit E, pg. 15.

93.    If the plaintiff told her on March 27, 2000 that he was suffering from irritability and fatigue,  she would have listed those complaints.  Exhibit E, pg. 15.

94.    If the plaintiff told her on March 27, 2000 that he had lost a significant amount of weight, she would have listed that on the form.  Exhibit E, pg. 15.

95.    If the plaintiff told her on March 27, 2000 that he had heat intolerance, she would have listed that on the form.  Exhibit E, pg. 15.

96.    She did take the plaintiff's temperature on 3/27/00 and his temperature was 98.7.  Exhibit E, pg. 15-16.

97.    The plaintiff was weighed and he weighed 204 on March 27, 2000.  Exhibit E, pg. 17.

98.    She took the plaintiff's pulse on March 27, 2000 and it was 68.  Exhibit E, pg. 16.

99.    She took the plaintiff's blood pressure on March 27, 2000 and it was 110/60.  Exhibit E, pg.16.

100.    The plaintiff did not give her a list of any illnesses or acute problems on March 27, 2000.  Exhibit E, pg. 18.

The court notes the plaintiff's response to Dr. Funk's summary judgment motion, d/e 68:

> Plaintiff believes that his prior filings in this matter demonstrate that material disputes of fact remain as to whether Defendants appropriately treated Plaintiff's complaints. As discussed at the last telephonic status conference with the Court, Plaintiff elects to rest on his previous filings to demonstrate the existence of such disputes of fact.

The court notes the following relevant plaintiff's prior filings: 1) original complaint, d/e 1; 2) amended complaint, d/e 35; 3) response to Dr. Kurian's summary judgment motion, d/e 56; 4) response to Dr. Funk's summary judgment motion, d/e 61; response to summary judgment motions and motion to strike summary judgment motions, d/e 65.  The court notes that the plaintiff's responses address the issue of exhaustion of administrative remedies, which the court ruled on in its March 15, 2005 order.  The issue of exhaustion is not an issue in the summary judgment motion that is currently before this court.

## Discussion

8

The standard for liability under the Eighth Amendment is deliberate indifference, which is more than negligence and approaches intentional wrongdoing. See *Collignon v. Milwaukee County*, 163 F. 3d 982, 988 (7th Cir. 1998). Deliberate indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). The injury or need must be objectively serious, *and* the official must personally know of the risk and consciously disregard it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v. Fairman*, 120 F.3d 88. 91 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593 (2001). An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373. The subjective component (deliberate indifference) does not encompass negligence or even gross negligence. *Id.*, *citing Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991); *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The prisoner must "show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." *Wynn*, 251 F.3d at 593, *citing Farmer v. Brennan*, 511 U.S. at 837; *Zentmyer*, 220 F.3d at 811. A prisoner is not required to show that he or she was "literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)(jury could find deliberate indifference, "[i]f knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell.").

Deliberate indifference may also be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Farmer v. Brennan,* 511 U.S. 825, 128 L.Ed. 2d 811, 114 S.Ct. 1970 (1994); *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances.").

Malpractice or disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). A complaint that a physician was negligent in diagnosing or treating an inmate's medical condition does not state a valid Eighth Amendment claim. See *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001). *See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996)(quoting with approval the Eighth Circuit in *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (1996)(abrogated on other grounds in *Reece v. Groose*, 60 F.3d 487 (8th Cir. 1995)): "'An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed.'"(emphasis in *Langston*)).

9

The undisputed facts demonstrate that the plaintiff did not complain of sumptomatology associated with Grave's Disease when seen by Dr. Kurian. The plaintiff alleged in his complaint that he was seen by Dr. Kurian on several occasions between March 1, 2000 and December 5, 2000 and that he reported the following symptoms to Dr. Kurian during that period of time: weight loss, excessive sweating, sleeplessness, dizzy spells, tremors, blurred vision, frequent urination, diarrhea, swelling of the thyroid gland, fever, extreme irritability, memory loss, and inability to concentrate. Defendant Kurian acknowledges that some of those symptoms are typically associated with Grave's disease. However, based upon the plaintiff's own admissions, the medical records, and the deposition testimony of Nurse Jennifer Encarnacion, the plaintiff did not present with those symptoms or complain of those symptoms prior to being seen by Dr. Kurian on March 27, 2000 and September 6, 2000. Dr. Kurian first saw the plaintiff at Stateville Correctional Center on March 27, 2000. Nurse Jennifer Encarnacion was employed at Stateville Correctional Facility in March 2000 and her duties included the task of interviewing patients before the patients were seen by staff physicians. Encarnacion testified under oath that the physical examination report form dated March 27, 2000 contained her handwriting, her signature, that it was generated at the time of the event, and that it contained accurate information. She also testified that it was her standard practice to ask the inmate a number of questions during the physical examination work- up  interview and to check appropriate boxes on the form to indicate the patient's past medical history, present complaints, and the results of the nurse's physical examination. The reception and periodic medical history form completed by Encarnacion indicates that the plaintiff, Kurtis Williams, denied a history of three or more months of fever, diarrhea, and night sweats. The plaintiff also denied weight loss, fatigue, or other complaints. Encarnacion testified that she would have recorded any and all symptoms that were reported by the plaintiff, especially those symptoms that suggested hyperthyroidism (irritability, profuse sweating, protruding eyes, fatigue, fast heartbeat, weight loss, heat intolerance, and diarrhea). She further confirmed that during her physical examination of the plaintiff on March 27, 2000, she completed a work-up of the plaintiff and her efforts determined that the plaintiff weighed 204 pounds, and that his heart rate and blood pressure were within normal limits. The testimony of Encarnacion demonstrates that the plaintiff failed to complain of any ailments or symptomatology commonly associated with hyperthyroidism immediately before Dr. Kurian's examination of the plaintiff on March 27, 2000. Similar to Nurse Encarnacion, Dr. Kurian testified that the plaintiff did not complain of inability to sleep, severe weight loss, protruding eyes, or excessive perspiration during his examination on March 27, 2000. Dr. Kurian concluded on March 27, 2000 that the plaintiff had sinus tenderness, defective vision, a mental health condition of bipolar disorder, sinusitis, tinea pubis (a fungal infection of the skin of the genitalia), that plaintiff's pupils reacted properly to light, that the plaintiff had normal respiration and heart rate, that the plaintiff's abdomen was soft with no tenderness, and that there was no spinous tenderness existed. Dr. Kurian also determined that the plaintiff's neurological examination was normal, that the tubercular test was normal, and that plaintiff's ears and nose were normal. The specific findings made by Dr. Kurian demonstrated the thoroughness of his examination of the plaintiff and the fact that all areas of the plaintiff's body were examined. For example, during the examination Dr. Kurian observed a scar on the plaintiff's left forearm, right knee, and on his spine. He also observed a tattoo on the plaintiff's arm. Dr. Kurian prescribed Mycolog ointment and Amoxicillin

to treat the plaintiff's tinea pubis and sinusitis.  Dr. Kurian confirmed that he placed his hands upon the patient in order to conduct the physical examination and confirmed that if the plaintiff complained of any ailments associated with Grave's disease he would have reported those symptoms in the medical record dated March 27, 2000.  The plaintiff himself has admitted that during the March 27,2000 clinical examination Dr. Kurian asked him what  problems he was having and that he told Dr. Kurian that he was having discomfort in his sinuses.

The plaintiff does not dispute Dr. Kurian's following assertions:

> [I]t is clear that the plaintiff did not present with any symptomatology consistent with hyperthyroidism during Dr. Kurian's March 27, 2000 examination. The other staff physicians or correctional medical technicians that examined the plaintiff between March 27, 2000 and September 6, 2000  (the date of Dr. Kurian's second examination of the plaintiff) also noted in the medical records that the plaintiff failed to complain of any symptoms associated with hyperthyroidism. For example, a medical note dated 5/23/00 demonstrates that the plaintiff complained to Medical Technician Peterson that he had low back pain only...  There were no complaints of any other symptoms, especially any symptoms associated with hyperthyroidism...  A medical note dated 8/11/00 also demonstrates that the plaintiff complained to Medical Technician Peterson that he had low back pain and that he wanted a prescription for Motrin...  There was no complaint of any other symptoms, especially any symptom associated with hyperthyroidism...  A medical note dated 9/5/00 evidences that the plaintiff was seen by Medical Technician Peterson and that he complained of a history of sinus problems for two weeks...  There was no complaint of any symptoms associated with hyperthyroidism...  Dr. Kurian next saw the plaintiff on 9/6/00... The progress  note dated 9/6/00 indicates that Dr. Kurian saw the plaintiff at 9:28 a.m., and that the plaintiff was being examined during sick call with complaints of stuffy nose, headache, and facial pains...  The plaintiff had been previously seen by a correctional medical technician on 9/5/00 with a complaint of sinus problems for two weeks...  During the clinical examination of the plaintiff on 9/6/00, Dr. Kurian noted that the patient was alert, awake, and had minimal congestion in his nose. See above, Section II, B, Par. 20. Dr. Kurian also noted that the plaintiff had sinus tenderness and throat congestion...  Dr. Kurian diagnosed sinusitis, prescribed Amoxicillin and Tylenol and told the plaintiff to return to the clinic as needed...  Dr. Kurian denied observing any symptoms of weight loss, nervousness, or protruding eyes during his examination of the plaintiff at Stateville Correctional Facility...  The first time plaintiff ever reported any symptoms remotely associated with

11

hyperthyroidism was on 10/1/00, when he reported to Medical
Technician Taylor that he had excessive sweating and difficulty
breathing... Plaintiff was examined again on 10/3/00 by Medical
Technician Bob Cateneo and the plaintiff complained of trouble
breathing and upper respiratory infection type symptoms... Shortly
thereafter, the plaintiff was seen in the correctional emergency room
by Dr. Tilden, a non-party... Dr. Tilden is a staff physician at
Stateville Correctional Facility and examined the plaintiff
on10/3/00. Dr. Tilden had no independent recollection of the
10/3/00 examination of the plaintiff but testified that the progress
note contained his handwritten entries, his signature, and that the
progress note was generated at or near the time of the event and that
the document was accurate... Dr. Tilden's 10/3/00 progress note
indicated that the plaintiff gave a history of cold symptoms for a
two week period and that the plaintiff had a cough along with
redness in the pharynx area... During Dr. Tilden's clinical
examination it was noted that the patient was wheezing... Dr.
Tilden diagnosed: (1) rule out bronchitis with chest x-ray; and (2)
rhinitis (inflammation of the nasal cavity)... Dr. Tilden prescribed
erythromycin, a decongestant, and Tylenol. II, D... Dr. Tilden
denied that the plaintiff reported or that the plaintiff presented with
rapid pulse, irritability, tremors, weight loss, nervousness,
protruding eyes, enlarged thyroid gland, or any other symptoms
which would suggest to a reasonably competent physician that the
plaintiff was suffering from hyperthyroidism... Based on the
foregoing medical records, there is no evidence which would
suggest that the plaintiff complained of or presented with any
symptomatology commonly associated with hyperthyroidism during
Dr. Kurian's examination of the plaintiff on 3/27/00 and 9/6/00.
Moreover, Dr. Tilden's clinical examination on 10/3/00 supports
Dr. Kurian's position that the plaintiff neither complained of nor
presented with any symptomatology commonly associated with
hyperthyroidism prior to 10/3/00.

The plaintiff alleges that Dr. Kurian improperly examined him at Pontiac Correctional
Facility and that Dr. Kurian failed to "place his hands upon" the plaintiff during the clinical
examinations. However, Dr. Kurian asserts, without dispute from the plaintiff, that the medical
records which memorialize Dr. Kurian's examination of the plaintiff on February 21, 2002 and
October 2, 2002 demonstrate that Dr. Kurian obtained a thorough history from the plaintiff,
conducted a thorough clinical examination, and properly treated the plaintiff for the medical
conditions that existed on those dates. For example, Dr. Kurian's progress note dated February
21, 2002 indicates that the plaintiff complained of sore throat, cough, chest pains, shortness of
breath, severe headaches, and fatigue for three days. The plaintiff further gave a history of sinus
problems and the fact that he was a smoker. During the clinical examination, Dr. Kurian noted
that the plaintiff's sinuses were tender, that he had minimal congestion in the throat, and Dr.

Kurian diagnosed upper respiratory infection and ordered a chest x-ray to rule out pneumonia or bronchitis. Dr. Kurian prescribed erythromycin, Tylenol, and ordered the plaintiff to return to sick call in seven days.

Further, the evidence further demonstrates that Dr. Kurian saw the plaintiff on October 2, 2002. The plaintiff complained of problems swallowing, history of excessive sweating, tenderness in his eyes, and the fact that he was taken off the PTU medication which had been prescribed earlier to treat his hyperthyroidism. Dr. Kurian conducted a clinical examination and referred the plaintiff to the ophthalmology clinic and scheduled a follow up with the plaintiff in two weeks after lab results were conducted and completed. Dr. Kurian also testified during his deposition that it was his practice to place his hands upon patients when conducting clinical examinations. Dr. Kurian asserts, without dispute from the plaintiff that the medical assessments made by Dr. Kurian after his clinical examination of the plaintiff on February 21, 2002 and October 2, 2002 at Pontiac Correctional Facility were the result of thorough examinations and conducted according to existing standards of care.

The medical judgments made by Dr. Kurian were made in his professional capacity and are presumptively valid. *See Youngberg v. Romeo*, 457 U.S. 307, 323, 73 L.Ed. 2d 28, 102 S.Ct. 2452 (1982). The Seventh Circuit has concluded that the presumption of validity was applicable to allegations of improper medical treatment and whether or not the defendant exhibited deliberate indifference. *See Cole v. Fromm,* 94F.3d 254 (7th Cir. 1996). The plaintiff has presented no evidence to overcome the presumption of validity. In other words, plaintiff has not demonstrated that Dr. Kurian provided inadequate medical care that was a substantial departure from accepted professional judgment, practice, or standards. Therefore, in the absence of a genuine issue of material fact, summary judgment is granted in favor of Dr. Kurian and against the plaintiff.

**It is therefore ordered:**

1.     **Pursuant to Fed. R. Civ. P. Rule 56(c), Dr. Kurian's summary judgment motion, d/e 63, is granted. The clerk of the court is directed to enter judgment in favor of Dr. Kurian and against the Plaintiff at the close of this case.**
2.     **If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $255.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).**
3.     **This case is terminated in its entirety.**

**Enter this 27th  day of March 2006.**

              **s\Harold A. Baker**
              **HAROLD A. BAKER**
          **UNITED STATES DISTRICT JUDGE**